## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| JAMES CARNICELLI, JR., | : |
| Plaintiff, | : |
| vs. | : |
| JOHN J. FARERI, JULIE FARERI, CHRISTOPHER SHESKIER, and THE GATEWAY DEVELOPMENT GROUP, INC., | : Civil Action No. 3:21-cv-00792-RNC |
| Defendants; | : |
| and | : |
| JAMES CARNICELLI, JR., | : |
| Derivative Plaintiff, | : |
| vs. | : |
| JOHN J. FARERI, JULIE FARERI, and CHRISTOPHER SHESKIER, | : |
| Derivative Defendants, | : |
| and | : |
| THE GATEWAY DEVELOPMENT GROUP, INC., | : |
| Nominal Defendant | : June 16, 2021 |

## MEMORANDUM OF LAW IN SUPPORT OF (i) PLAINTIFF'S OPPOSITION TO MOTION FOR TRANSFER OF VENUE AND (ii) MOTION TO REMAND PURSUANT TO 28 U.S.C § 1452.

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. 2

TABLE OF AUTHORITIES ........................................................................................... 3

PRELIMINARY STATEMENT ...................................................................................... 4

PROCEDURAL AND FACTUAL BACKGROUND....................................................... 5

ARGUMENT ................................................................................................................. 12

    I.    Equitable Considerations Pursuant to 28 U.S.C. § 1452(b) Warrants a Decision to Remand the Entire Action ....................................................................................................... 12

    II.    Initial Removal was Improper...................................................................... 15

    III.    If the Court Decides that the Entire Action Should Not Be Remanded, In the Alternative, There is No Basis to Remove Mr. Carnicelli's Direct Claims Against Defendant as Those Claims are Not Related to the Bankruptcy ............................................... 16

    IV.    Removing and Transferring the Action to the Bankruptcy Court is Premature and a Waste of Judicial Resources ........................................................................................ 18

CONCLUSION.............................................................................................................. 20

# TABLE OF AUTHORITIES

**Cases**

*Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085 (2d Cir. 1995) .................................................. 17

*In re Tronox, Inc.*, 855 F.3d 84 (2d Cir. 2017) .......................................................................... 17

*Master-Halco Inc. v. Scillia Dowling & Natarelli LLC*, 2006 WL 6915644, at *3 (D. Conn. 2006) ........................................................................................................................ 13

**Statutes**

28 U.S.C. § 1412 ........................................................................................................................... 4

28 U.S.C. § 1452 ........................................................................................................................... 4

28 U.S.C. § 1452(a) ..................................................................................................................... 15

28 U.S.C. § 1452(b) ..................................................................................................................... 12

28 U.S.C. 1334(c)(1) ................................................................................................................... 13

**Rules**

Fed. R. Bankr. P. 7087 .................................................................................................................. 4

Plaintiff James Carnicelli, Jr. ("Mr. Carnicelli"), by and through his undersigned counsel, respectfully submits this Memorandum of Law in Support of (i) Plaintiff's Opposition (the "Opposition") to Motion for Transfer of Venue Pursuant to 28 U.S.C. § 1412 and Fed. R. Bankr. P. 7087 (the "Motion to Transfer") filed by Howard P. Magaliff, chapter 7 trustee (the "Trustee") of the bankruptcy estate of The Gateway Development Group, Inc. (the "Company" or "Gateway Development") and (ii) Plaintiff's Motion to Remand Plaintiff's Direct Claims Pursuant to 28 U.S.C. § 1452 ("Motion to Remand").

## **PRELIMINARY STATEMENT**

This Motion to Transfer and the removal this action, which filed in the Connecticut Superior Court in the Judicial District of Stamford/Norwalk at Stamford (the "Connecticut Action"), to this Court represent another attempt to deprive Mr. Carnicelli of his rights to pursue his claims against John J. Fareri ("Mr. Fareri") and recover damages. By removing the claims and transferring the claims to the Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), the Trustee is inadvertently assisting Mr. Fareri in avoiding his obligations in the Connecticut Action and other obligations that Mr. Fareri had as a result of his unlawful conduct.

It is Mr. Carnicelli's position that the bankruptcy filed by Mr. Fareri, to which the Trustee is trying to transfer the Connecticut Action, was made in bad faith, is

fraudulent and should be dismissed. A Motion to dismiss has been filed in the Southern District of New York Bankruptcy Court and will be heard on July 12, 2021. Therefore, this Court should deny the Motion to Transfer and grant Mr. Carnicelli's Motion to Remand so that the Connecticut Action can be restored to the status quo. At a minimum, this Court should not transfer Mr. Carnicelli's personal claims against Mr. Fareri, and should remand these claims

## PROCEDURAL AND FACTUAL BACKGROUND

Mr. Carnicelli is the President and minority shareholder of Gateway Development, who commenced the Connecticut Action individually and derivatively to hold the Company's majority shareholder and officers accountable for their wrongful actions against the Company and Plaintiff. Defendant Mr. Fareri is a real estate mogul, the Company's majority shareholder, Chairman of the Company's Board of Directors and purported CEO of the Company. (Complaint ¶ 2). Defendant Julie Fareri ("Ms. Fareri") is Secretary of the Company, and Defendant Christopher Sheskier ("Mr. Sheskier," together with Mr. Fareri and Ms. Fareri, the "Individual Defendants") is the self-proclaimed Chief Financial Officer of the Company and accountant for the Company. (Compl. ¶¶ 8, 9, 10).

The Individual Defendants are a director and officers of the Company, a construction management services business, who schemed to deprive Plaintiff of

compensation and equity that he was owed as President of the Company and as the minority shareholder of the Company. (Compl. ¶ 4, 36).

The Individual Defendants violated fiduciary duties owed to the Company, misstated and improperly altered the Company's financial records, and diverted and usurped profits and opportunities belonging to the Company. (Compl. ¶¶ 4, 36). When Mr. Carnicelli questioned the Individual Defendants' conduct and demanded that the Company be paid profits it had earned, he was purportedly removed as President of the Company in October 2019, without corporate authority and in blatant violation of the parties' shareholder agreement, and the Company's operations were halted, and its assets and opportunities further diverted to competing businesses owned and/or controlled by Mr. Fareri. (Compl. ¶¶ 3, 4, 31, 36). Mr. Carnicelli's derivative claims arise out of construction management services performed by the Company on certain projects for Fareri related entities that Mr. Fareri and the other Individual Defendants have caused to not properly pay the Company. (Compl. ¶¶ 5, 31).

In December of 2019, Mr. Carnicelli derivatively commenced an American Arbitration Association arbitration on behalf of the Company against one such Fareri related entity, Gateway Kensington, LLC ("Gateway Kensington"), seeking $16,094,720 in fees due to the Company for services that it had rendered on a certain

project (the "Kensington Arbitration").[1] On or around April 23, 2021, the panel of three arbitrators awarded the Company **$14,228,806.00** and Mr. Carnicelli $104,640.38 for a total of **$14,333,446.38** (the "Award"). The Award is attached hereto as Exhibit A. This Award reflected a finding by the Panel that an entity controlled by Fareri had underpaid Gateway Development for the Project. Mr. Carnicelli's position is that this was done on purpose by Fareri as part of a scheme. On May 4, 2021, Mr. Carnicelli filed a Petition to Confirm the Arbitration Award in the Westchester County Supreme Court (the "New York Action"). The return date was May 14, 2021. Instead of filing a response in the New York Action, on May 14, 2021, Gateway Kensington filed a voluntary Chapter 11 petition. The Chapter 11 was signed by Mr. Fareri, the 99% owner of Gateway Kensington. It effectively stayed the New York Action, blocking Mr. Carnicelli's efforts to collect the $14 million Award.

In October of 2020, Mr. Carnicelli commenced the Connecticut Action in which he asserted twelve causes of action, seven direct claims and five derivative claims on behalf of Gateway Development. These claims seek damages in excess of $50 million. The Claims assert that in multiple other Projects, other than Gateway Kensington, Mr. Fareri purposely directed funds away from Gateway Development

---

[1] American Arbitration Case No. 01-19-0004-4927, In the Matter of the Arbitration between: James Carnicelli Jr. Derivatively on behalf of The Gateway Development Group, Inc and Gateway Kensington, LLC.

for his own benefit. Mr. Carnicelli also filed a Motion for Temporary Injunction and Application for Prejudgment Remedy (dkt. 104.00), which the Honorable Judge Sheila A. Ozalis set down for a hearing on August 9, 2021 (the "August 9 Injunction Hearing"). On January 11, 2021, Defendants filed a Motion to Dismiss asking the Court to dismiss counts five through twelve for lack of subject matter jurisdiction or in the alternative stay the action pending arbitration. (dkt. 112.00). Judge Ozalis denied the Motion to Dismiss as to counts 5 and 7 through 12 and in denying the Motion to Dismiss on those counts ruled that Mr. Carnicelli has the right to bring such derivative claims. Judge Ozalis made the following findings:

> In the present case, the plaintiff also has the status of one of two shareholders in [the Debtor] and has alleged in the derivative claims asserted in Count Eight through Twelve, that John Fareri, the only other shareholder in the corporation is responsible for the harm to the corporation. There is no other similarly situated shareholder that can assert these claims and the plaintiff's interests do in fact align with [the Debtor]'s, which ensures that the return of assets to [the Debtor] will be vigorously litigated. While the plaintiff has brought individual claims in this action, those claims are not adverse to the interests of any similarly situated shareholder. Finally, while the plaintiff has asserted a claim for judicial dissolution of [the Debtor] based on actions of John Fareri, it is clear from the allegations in the complaint that the true adverse party is John Fareri who controls [the Debtor], whom plaintiff alleges acted in an illegal, oppressive, fraudulent manner and who has misapplied or wasted [the Debtor]'s assets. ... Based on the present facts, it is clear that the plaintiff should not be prevented from bringing the derivative claims set forth in Counts Eight through Twelve of the Complaint.

> Based on the foregoing, this Court finds that plaintiff has standing to assert the derivative claims asserted in the Eighth through Twelfth

Counts of the Complaint and the defendants' Motion to Dismiss such claims is denied.

(dkt. 112.01; Ex. B p. 10).

Defendants also filed a Motion to Compel Arbitration on February 2, 2021. (dkt. 117.00). In a Memorandum of Decision dated March 19, 2021, Judge Sheila Ozalis denied the Motion to Compel Arbitration. (dkt. 117.01). In addition, the court entered a scheduling order governing discovery for the matter and the parties had an agreement on a discovery schedule for the August 9 Injunction Hearing. (dkt. 127.00; Ex. C).

On May 11, 2021, after the issuance of the Award and the commencement of the New York Action to confirm the Award, Mr. Carnicelli filed a new Motion for Temporary Injunction and Preliminary Injunction in the Connecticut Action to restrict the Individual Defendants from moving or manipulating any monies if and when they were paid to Gateway Development in satisfaction of the Award. (dkt. 133.00). Judge Ozalis set the Preliminary Injunction hearing for May 26, 2021. Discovery was also due for the Individual Defendants on June 4, 2021. The day before the hearing, on May 25, 2021, Gateway Development filed a Chapter 7 petition (the "Bankruptcy Action") in the Bankruptcy Court (C.A. No. 21-22304-rrd). The Chapter 7 petition was signed by Mr. Fareri and filed without consultation with Mr. Carnicelli, Gateway Development's President and 49% shareholder.

The bankruptcy itself is of a highly questionable nature. In balance sheets prepared using Gateway Development's Quickbooks clearly show that the assets of the Company far exceed the liabilities of the Company. In fact, even the petition itself in the Bankruptcy Action indicates that the assets of the Company exceed the liabilities of the Company. Furthermore, the Company had just won the Award, which is an asset of more than $14 million. It is apparent that the bankruptcy filing was made in bad faith to sabotage Mr. Carnicelli's efforts to hold Mr. Fareri accountable for his misconduct by forcing a halt to the Connecticut Action.

Accordingly, on June 4, 2021, Mr. Carnicelli filed a Motion to Dismiss, followed by an Amended Motion to Dismiss on June 8, 2021. (Bankruptcy Dkt. 20 and 23). He sought an expedited hearing on the motion, to which the Trustee objected. The Bankruptcy Court set a hearing on the motion for July 12, 2021.

On June 2, 2021, the Trustee filed an Application for Order Authorizing the Trustee to Retain Zeisler & Zeisler, P.C. ("Z & Z") as Special Counsel (the "Z & Z Application"). On June 3, 2021, less than 24 hours after the Application was made, and before Mr. Carnicelli had an opportunity to object, the Bankruptcy Court entered an Order Authorizing the Trustee to Retain Zeisler & Zeisler, P.C. as Special Counsel (the "Special Counsel Order"). The next day, June 4, 2021, Mr. Carnicelli filed a Motion to Reconsider the Special Counsel Order (the "Motion to Reconsider").

On June 8, 2021, Debtor filed its Schedules A/B, D, E/F, G, H and the Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy (collectively, the "Schedules"). The Schedules list the Connecticut Action and two other actions as pending actions in which the Company was involved in any capacity: (i) *Westchester Stucco, Inc. vs. The Gateway Development Group, Inc., Sterling National Bank, Atlantic Specialty Insurance Company, and Titan Concrete, Inc.* (61592/2018) and (ii) the New York Action.

On June 10, 2021, the Trustee filed an Application for Order Authorizing the Trustee to Retain Pullman & Comley, LLC ("P & C") as Special Counsel to the Trustee and to Vacate the Order Authorizing Retention of Zeisler & Zeisler, P.C (the "P & C Application").[2] That same day, Mr. Carnicelli filed an Objection to the P & C Application. The Bankruptcy Court has scheduled a hearing on the P & C Application for June 17, 2021.

On the same day, P & C filed a Notice of Removal (the "Initial Notice of Removal") in the Connecticut Action (the "Initial Removal"), removing this action to this Court *prior to being appointed special counsel by the Bankruptcy Court.* This act was of course unlawful. When Mr. Carnicelli brought to the Bankruptcy Court's attention that P & C had filed a notice of removal in the Connecticut Action despite

---

[2] The Chapter 7 Trustee and Z & Z presumably agreed that Mr. Carnicelli's Motion to Reconsider was correct, at least on certain points.

not being appointed counsel, the Trustee filed an amended Notice of Removal (the "Amended Notice of Removal") in the Connecticut Action on June 11, 2021.

Seeming to have not learned from its mistake, P & C also filed a Notice of Appearance in this Court on June 14, 2021, without any qualification or indication that there was any question about the approval of their retention to represent the Trustee, while the P & C Application is still pending in front of the Honorable Judge Robert D. Drain. On the same day, P & C filed the Motion to Transfer, still without being named counsel. The Motion to Transfer contained a qualification that P & C were the Trustee's attorneys "***application pending***" in the signature block. The Court has not decided on whether P & C can serve as the Trustee's special counsel and has set a hearing on the Application on June 17, 2021. P & C and the Trustee's actions are premature, at best.

For reasons stated in more detail below, this removal is improper and premature and therefore the Trustee's Motion to Transfer should be denied and Plaintiff's Motion to Remand should be granted.

## **ARGUMENT**

### I. *Equitable Considerations Pursuant to 28 U.S.C. § 1452(b) Warrants a Decision to Remand the Entire Action*

28 U.S.C. § 1452(b) provides: "the court to which such claim or cause of action is removed may remand such claim or cause of action on any equitable ground." 28 U.S.C. § 1452(b). The equitable considerations pursuant to 28 U.S.C. §

1452 warrant a decision to remand. Those equitable considerations include (i) whether issues of state law predominate; (2) whether judicial economy would be served by abstention or equitable remand; (3) whether §1334(b) is the sole basis for exercising federal jurisdiction; (4) whether the proceeding involves non-debtors; (5) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case; and (6) the likelihood that the proceeding was commenced in a particular forum because of forum shopping on the part of one of the parties." *Master-Halco Inc. v. Scillia Dowling & Natarelli LLC*, 2006 WL 6915644, at \*3 (D. Conn. 2006).

Additionally, 28 U.S.C. 1334(c)(1) provides that "nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11."

The equitable considerations and the interests of justice favor remand of the entire action here. First, all of Mr. Carnicelli's claims are brought under Connecticut common and statutory law. Second, as described in more detail below, judicial economy is best served if this Court chooses to abstain or equitably remand the case back to the Connecticut Superior Court. There is a Motion to Dismiss pending in the Bankruptcy Action that is set for a hearing on July 12, 2021. The Motion to Dismiss is attached hereto as Exhibit A. If the Connecticut Action is transferred to the

Bankruptcy Court and the Bankruptcy Court ultimately dismisses the case, judicial resources will be wasted in restoring the Connecticut Action to the status quo.

Third, there are three Defendants in the Connecticut Action that are non-debtors (Mr. Fareri, Ms. Fareri and Mr. Sheskier), which the bankruptcy proceeding does not involve. Finally, the Connecticut Action and the Bankruptcy Action are remote, with the exception that the Bankruptcy Action was clearly filed by Mr. Fareri to avoid obligations in the Connecticut Action and the Award.

More broadly, the entire action should be remanded on equitable grounds and in the interest of justice because, as mentioned earlier, the Bankruptcy Action was a bad faith filing by Mr. Fareri to deprive Mr. Carnicelli of his ability to pursue the Connecticut Action and the confirmation of the Award. The Bankruptcy Action was filed *the week before* Defendants were to produce documents as part of discovery in the Connecticut Action and *the day before* a preliminary injunction hearing was to be held in the Connecticut Action. The Bankruptcy Action is related to the Kensington Bankruptcy, which was filed *on the return date* in the New York Action. These were all steps taken by Mr. Fareri to deprive Mr. Carnicelli of the ability to vigorously litigate and recover and therefore in the interest of justice, the Motion to Transfer should be denied and the Motion to Remand should be granted.

## II.    *Initial Removal was Improper*

This action should also be remanded because the Notice of Removal, signed and filed by P & C was unauthorized and improper. As stated above, the Trustee's application to retain P & C as special counsel was not approved when P & C filed the Notice of Removal. Indeed, the application still has not been approved and the Bankruptcy Court has scheduled a hearing. This is not a case in which approval of counsel might essentially be a formality. Mr. Carnicelli has interposed serious objections to the Trustee's expending resources on special counsel in view of the substantial indications that the Gateway Development bankruptcy was filed in bad faith and should be dismissed.

Accordingly, P & C acted without authority when it filed the Initial Notice of Removal. Section 1452(a) clearly states that "*a party* may remove any claim or cause of action in a civil action…to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title." 28 U.S.C. § 1452(a) (emphasis added). At the time, P & C filed the notice of removal, P & C was not counsel to any party.

After this hasty filing was brought to the Bankruptcy Court's attention, the Trustee filed the Amended Notice of Removal to effectuate the removal of the Connecticut Action to this Court. In his Motion to Transfer, the Trustee states that "[T]he Amended Notice of Removal was filed because counsel for the Plaintiff in

the [Connecticut] Action had ***complained*** that an order of the Bankruptcy Court had not yet entered approving P&C's employment and called into question the effectiveness of the Notice of Removal." *See Mot. to Transfer* ¶ 5 n.2. (emphasis added).

While the Trustee disparages Plaintiff's objections as ***"complaining,"*** in fact the Trustee's undue haste to wrest control of the claims in the Connecticut Action warrants judicial scrutiny. There is no apparent reason why P & C needed to rush to enter a notice of removal in the Connecticut Action when its "application is pending."

### III. *If the Court Decides that the Entire Action Should Not Be Remanded, In the Alternative, There is No Basis to Remove Mr. Carnicelli's Direct Claims Against Defendant as Those Claims are Not Related to the Bankruptcy*

The Connecticut Action alleged twelve causes of action, seven direct claims and five derivative claims. After a motion to dismiss and a request to revise, five direct claims remain (as well as all five derivative claims).[3] Those claims are (i) an action for judicial dissolution against the Company (ii) breach of contract against Mr. Fareri and the Company, (iii) violation of Connecticut General Statutes § 31-72 against Mr. Fareri and the Company, (iv) breach of the covenant of good faith and fair dealing against Mr. Fareri and the Company, (v) fraud as to Mr. Fareri.[4] The direct claims Mr. Carnicelli has asserted against Mr. Fareri (Breach of Contract,

---

[3] Judge Ozalis dismissed Count 6 and Plaintiff agreed to remove Count 2 as part of a Request to Revise.
[4] Mr. Carnicelli intends to ask the Court to sever the claims for breach of contract, violation of the Connecticut General Statutes § 31-72 and the breach of the covenant of good faith and fair dealing.

Breach of the Covenant of Good Faith and Fair Dealing, Violation of Connecticut General Statutes § 31-72, and Fraud) are not related to the Bankruptcy Action.

The Trustee cannot pursue Mr. Carnicelli's personal direct claims against Mr. Fareri. When creditors "have a claim for injury that is particularized as to them, they are exclusively entitled to pursue that claim, and the bankruptcy trustee is precluded from doing so." *In re Tronox, Inc.*, 855 F.3d 84, 99 (2d Cir. 2017) (quoting *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1093 (2d Cir. 1995). These claims are particularized to Mr. Carnicelli and have nothing to do with the Bankruptcy Action or the bankruptcy estate.

The claim for breach of contract against Mr. Fareri alleges that Mr. Fareri through his wrongful actions breached the shareholders' agreement entered into by Mr. Carnicelli, Mr. Fareri and the Company. While the Company is a signatory to the shareholders' agreement, the claims against Mr. Fareri are distinct and any recovery for such damages would come from Mr. Fareri, personally. Thus, the breach of contract claim belongs to Mr. Carnicelli and should not be removed.

The breach of the covenant of good faith and fair dealing also alleges claims against Mr. Fareri that are distinct from claims alleged against the Company. Additionally, any recovery for the claims against Mr. Fareri would come from Mr. Fareri, personally.

The claim for fraud alleges that Mr. Fareri misrepresented to Mr. Carnicelli that he would receive substantial financial benefits from his ownership interest in the Company and that Mr. Carnicelli would receive shareholder distributions after the Company earned significant profits. These statements were untrue and therefore Mr. Carnicelli brought this fraud claim against Mr. Fareri. Damages that flow from this cause of action would flow only from Mr. Fareri, not from the Company. Therefore, this fraud claim and the above breach of contract and breach of the covenant of good faith and fair dealing claims are not property of the debtor, are not related to the bankruptcy (as the Trustee claims) and should be severed and remanded to the Connecticut Superior Court.

## IV. *Removing and Transferring the Action to the Bankruptcy Court is Premature and a Waste of Judicial Resources*

The removal of the Connecticut Action and the Motion to Transfer are premature and will waste judicial resources. As mentioned earlier, a Motion to Dismiss has been filed in the Bankruptcy Action to dismiss the entire action. The Motion to Dismiss was filed because the Bankruptcy Action is a fraudulent bankruptcy that was filed in bad faith and which Mr. Fareri filed to avoid his obligations coming due in the Connecticut Action and avoid paying the Award to the Company. The Motion to Dismiss raises serious doubts about the Bankruptcy Action, questions the timing of the filing, and lays out the bad faith and overall fraudulent nature of this filing.

When Mr. Carnicelli filed the Motion to Dismiss in the Bankruptcy Action, he also filed a Motion to Shorten Time to have the Motion to Dismiss heard quickly in light of the situation and the strong evidence that the Bankruptcy Action was a fraudulent filing. The Trustee almost immediately objected to an expedited hearing on the Motion to Dismiss and is now moving quickly to take control over the Connecticut Action, and only the Connecticut Action.

It is unseemly that the Trustee is not rushing in to remove and transfer the other two actions listed in Company's Schedules as no filings have been made in either case to remove the action to the Bankruptcy Court, just this action. The Trustee cannot be rushing into the Connecticut Action, removing it, transferring it to the Bankruptcy Court and stating that until the Motion to Dismiss is granted the Trustee should be allowed to administer the estate when he objected to Mr. Carnicelli's Motion to Shorten Time to expeditiously hear the Motion to Dismiss.

The Trustee cannot express the need to expedite certain actions when it serves him best and then slow actions down that detriment the Company and claim to be acting in the best interest of the Company. Thus, removing and transferring the action to the Bankruptcy Court prior to a determination on the Motion to Dismiss will waste judicial resources and is premature, at best. At a minimum, the motions to remand and transfer should be stayed pending the Bankruptcy Court's decision on the Motion to Dismiss.

## CONCLUSION

**WHEREFORE**, Plaintiff respectfully requests that the Court deny the

Motion to Transfer and grant Plaintiff's Motion to Remand.

Dated:        June 16, 2021

Respectfully submitted,

PLAINTIFF,
JAMES CARNICELLI, JR.


By: /s/ Joseph M. Pastore III
Joseph M. Pastore III, Esq. (ct11431)
Pastore & Dailey LLC
4 High Ridge Park, Third Floor
Stamford, CT 06905
Tel: (203) 658-8454
Fax: (203) 717-5550

# EXHIBIT A

<u>AMERICAN ARBITRATION ASSOCIATION</u>
<u>Construction Industry Arbitration Tribunal</u>

In the Matter of the Arbitration between:

James Carnicelli, Jr. derivatively on behalf of

THE GATEWAY DEVELOPMENT GROUP, INC.

                                                    Claimant,

                    -and-

GATEWAY KENSINGTON, LLC. ,

                                                    Respondent.

Case No. 01-19-0004-4927

### AWARD OF ARBITRATORS

We, the undersigned arbitrators, having been designated in accordance with the arbitration agreement contained in the contract titled "Construction Management Agreement By and Between Gateway Kensington LLC and The Gateway Development Group, Inc." dated "as of May 5, 2014" ("Contract") and duly executed by Gateway Kensington LLC ("Kerisington") and The Gateway Development Group, Inc. ("Development") ("Kensington" and "Development" collectively "Parties"), having been duly sworn, and having heard the proofs and allegations of the Parties issue this Final Award of Arbitrators ("Final Award"). This arbitration proceeding was conducted under the American Arbitration Association's Construction Industry Arbitration Rules. Eight evidentiary hearings were held from December 8, 2020 through December 18, 2020, during which both fact and expert witnesses were called to testify by the Parties. The Parties were represented by counsel, to wit, Claimant was represented by Steven L. Levitt and Trevor Gomberg of Levitt, LLP and Respondent was represented by Timothy T. Corey, Jared Cohane and Molly M. Quinn

of Hinckley Allen & Snyder, LLP.   The Parties submitted post-hearing briefs and reply briefs which were received by the Panel.  After receipt of the briefs, with leave of the Panel, the Parties submitted letters concerning certain matters raised in the briefs.  The hearings were deemed closed on March 12, 2020, and by agreement of the parties the Award was due 45 days after closing.

### THE PARTIES

The claim is brought derivatively by James Carnicelli, Jr. ("Carnicelli") as minority shareholder of Development (49%) on behalf of Development to enforce its rights under the Contract.  Carnicelli was the president of Development and ran its day-to-day operations.  John Fareri ("Fareri") was the majority shareholder (51%) of Development.  Development was a construction management firm whose work mainly consisted of construction projects performed for its majority owner Fareri.

Fareri is a real estate developer, and in addition to holding a majority interest in Development, held a majority interest in Kensington (99%) with the remaining interest (1%) held by his spouse.   Kensington was formed to acquire, remediate, and develop a parcel of land in Bronxville, New York which is the subject of this dispute ("Project"), and Kensington retained Development as its construction manager for the Project.  The Project had a Brownfield component to it whereby Fareri, personally, could obtain income tax credits for remediating and developing the site.  The amount of the tax credit was primarily based on the cost of the cleanup and the cost of the construction of the buildings and appurtenant structures on the site.  The tax credit was available for Site Preparation work (contamination remediation) and for Tangible Property work (above ground construction).

## THE PLEADINGS & PRIOR PROCEEDINGS

### Demand for Arbitration

In its Demand for Arbitration, Development, through Carnicelli, alleged a breach of the Contract by Kensington for failing to pay the fees due to Development under the Contract. In an amplification of the claim submitted through a Detailed Statement of Claim which the Panel required of the Parties, Carnicelli also requested a dissolution of Development in addition to the breach of contract claim. Respondent moved to dismiss the dissolution claim on the grounds that the matter was not properly before the Panel, and that claim was dismissed by Order of the Panel dated June 24, 2020. The dismissal was solely based on jurisdictional grounds, and the Panel made no substantive ruling on the request for dissolution.

### Answering Statement and Counterclaim

Aside from what amounts to a general denial of the breach of contract claim and the objection to the dissolution claim discussed above, Kensington asserted several counterclaims. The first alleged a breach of the Contract by Development for overbilling and improper charges against the Project by Development acting through Carnicelli. In total Kensington sought $2,982,919.43 in damages. Kensington also asserted a breach of fiduciary duties claim against Carnicelli arising out of the same alleged excessive and improper billing against the Project by Development which, it claimed, were inconsistent with the Contract. In response to Kensington's motion to dismiss the dissolution claim, Development cross-moved to dismiss the breach of fiduciary duty claim which the Panel denied by the Order dated June 24, 2020 with leave to renew at the end of the proofs. This renewal of the motion proved unnecessary as shortly before the hearings, Kensington withdrew its counterclaims.

3

## FACTUAL BACKGROUND

### The Project

It is undisputed that Fareri through his real estate development company Fareri Associates, bid on and was selected by the Town of Bronxville as the developer of the Project. The contract of sale was eventually assigned to Kensington, a sole purpose entity, formed to purchase and develop the Property. Kensington proposed to clean-up the site and build condominiums. Kensington submitted an application to the New York State Department of Environmental Conservation ("NYSDEC") for acceptance into the Brownfield Cleanup Program. Kensington was accepted into the program, and in June 2014, Kensington and NYSDEC entered into a Brownfield Cleanup Agreement ("BCA") (R[1]-87). As stated above, the BCA provided for tax credits for Fareri personally based upon the success and cost of the Site Preparation work and the Tangible Property work.

### Agreements Between Kensington & Development for the Project

There were two agreements for the Project executed by the Parties. The first is dated December 7, 2015 for construction management services to be provided by Development. It is on standard AIA form A134-2009 titled "Standard Form of Agreement Between Owner and Construction Manager as Constructor where the basis of payment is the Cost of the Work Plus a Fee without a Guaranteed Maximum Price." (R-148, hereinafter "A134 Agreement") This standard form of agreement calls for the construction manager (Development) to bill the owner

---

[1] References to "R- " and "C- " are to hearing exhibits submitted by Respondent ( R) and Claimant ( C)

(Kensington) for the "cost" of the work, a defined term, plus a Construction Management Fee. In the A134 Agreement, the Construction Manager's fee was set at $0.00.

Throughout the remediation portion of the work at the Project and through the construction of the condominium structure, Development invoiced Kensington for the work consistent with the December 7, 2015 agreement. That is, invoices were sent for the cost of the work as billed by trade contractors and for the labor and other services provided by Development itself to the Project without mark-up and without a construction manager fee added. These invoices were paid, except for a small balance, by Kensington. The Site Preparation remediation work was completed in late 2016 and a Certificate of Completion was issued by NYSDEC on December 28, 2016. (C-22)

The document which is the subject of this dispute, the Contract, was dated "as of May 5, 2014," the approximate date when the Project commenced, and was indisputably executed on or about March 9, 2018 by Fareri on behalf of Kensington and Carnicelli on behalf of Development. At the time it was signed, the remediation work had been certified as complete by NYSDEC, and 97% of the overall project was certified to have been completed (R-12) The Contract provides for higher amounts to be paid to Development for its personnel performing work on the Project based upon market rates as found in the RSMeans estimating guide ("RSMeans"). In addition, the Contract provides for a construction management fee of 10% on the "Cost" of the work as defined in the Contract, plus a $1,250,000.00 bonus conditioned upon early completion of Brownfield Cleanup work. As stated above, it is undisputed that the Contract was signed by Carnicelli on behalf of Development and Fareri on behalf of Kensington.

The Brownfield Credit & Audit

In 2017, after receiving the Certificate of Completion for the Brownfield remediation work from NYSDEC, Kensington filed an IT-611.1 form with New York State requesting the tax credits (C-20). The IT-611.1 and accompanying schedules were prepared by in-house employees of Fareri and Kensington with the assistance and advice of outside consultants. Carnicelli was involved to the extent that he was asked by Kensington and did provide information to match Development personnel with the RSMeans categories. In arriving at the costs upon which the credit would be calculated, the IT-611.1 used the RSMeans rates for Development's employees, a completion bonus of $1,250,000.00, and a 10% construction manager's fee.

No back-up documents were required or submitted with the IT-611.1 but detailed schedules were attached showing the costs incurred for the remediation of the site from trade subcontractors and other entities providing work, labor, and services to the Project. The schedules also include the market RSMeans rates for Development personnel, a 10% construction manager's fee and a $1,250,000.00 early completion bonus for Development.   By letter of December 30, 2017, the New York State Department of Finance commenced an audit of the tax credit application and requested back-up documents from Fareri and his wife Brenda Fareri to support the costs alleged to have been incurred by Kensington for the remediation. (C-33).  Among the documents requested by NYS were specified invoices from certain vendors, among them, those supporting the claim for the work performed by Development, and the contract between Development and Kensington.

Admitted into evidence were a series of emails between Fareri's in-house employees including his chief financial officer Chris Sheskier, CPA and Joseph Moukattaf, some of which had Development's Carnicelli participating or copied, concerning the creation of a new

6

construction management agreement to submit to NYS in response to the audit request. This resulted in the creation of the Contract, the terms of which were dictated by Kensington. The allowable charges and fees to be paid to Development under the Contract were consistent with the charges claimed in the IT-611.1.

In addition to the Contract, after NYS's request for supporting back-up for the charges, Fareri's in-house representatives prepared new invoices from Development to Kensington consistent with the amounts claimed on the IT-611.1. The dates and invoice numbers of these new invoices were consistent with the actual invoices submitted contemporaneously by Development and paid by Kensington, but the amounts were based upon the RSMeans rates as provided in the Contract.

Among other things, the Contract and the new invoices were presented by Kensington to NYS in response to its audit. After some additional requests from NYS and submissions by Kensington, in July 2018 the Department of Finance finalized the audit, and with some adjustment downward, certified a $6,284,540.00 tax credit for the Site Preparation work that could be claimed by Fareri.

Thereafter, Kensington submitted its IT-611.1 for the Tangible Property portion of the Project using the Contract and the RSMeans rates and a 10% construction manager fee.

In the summer and fall of 2019 a dispute arose between Carnicelli and Fareri concerning the compensation to be paid to Development by Kensington on the Project. When Carnicelli rejected an offer from Fareri to settle claims on the Project and others performed by Development for Fareri entities, Carnicelli was summarily discharged from Development by Fareri, was locked out of the office by Fareri, and Development ceased to operate. Carnicelli was discharged on October 18, 2019. (C-85)

On December 30, 2019 Mr. Sheskier sent a letter on "John Fareri" personal letterhead to the NYS Audit Bureau confirming a conversation of November 8th in which Sheskier stated that certain cost "discrepancies" related to the Tangible Property Credit shown on the IT-611.1 for the tax year 2017 had been found and the costs were overstated (R-108). In the letter, Mr. Sheskier noted that Kensington was in the process of an "internal audit" which would result in the removal of certain costs from the submission. With the letter, Kensington submitted an amended IT-611.1 for the Tangible Tax Credit which eliminated all Development labor charges. The amended IT 611.1 for the Tangible Site Credit was ultimately approved by New York State.

As to the already approved Site Preparation Credit, on November 25, 2020, Kensington submitted a Voluntary Disclosure Application with NYS stating that the 2016 Site Preparation Credit for 2016 had been overstated and requesting permission to amend its IT-611.1 which had been approved by NYS in July 2018. As of the conclusion of the hearings, NYS had not acted on the request to amend the IT-611.1 for the Site Preparation work.

## CLAIMS OF THE PARTIES

### Claims of Carnicelli on behalf of Development

Carnicelli's claim on behalf of Development is quite straightforward. He seeks to enforce the terms of the Contract and be paid as shown on the new invoices. He alleges that the Contract was not conditioned upon receipt of the tax credits by Fareri, and that Development is entitled to the benefits of the Contract including the completion bonus, the construction management fee and the costs based upon the RSMeans rates. Carnicelli further argues that although he was involved with and did prepare the drafts and final version of the Contract, the terms of the Contract were dictated by Fareri's representatives to increase the tax credit and to fulfill Fareri's agreement to

fairly compensate Development for its work on the Project. Carnicelli also argues that he was not involved with the tax credit applications which benefited Fareri only.

Claims and Defenses of Kensington

Kensington did not initially plead nor argue in its pre-hearing submissions and motion papers that the Contract was unenforceable, and in fact, Kensington asserted counterclaims based upon the Contract. Shortly before the hearings began, Kensington's position changed, and the central point of Kensington's defense at the hearings was that Fareri was unaware that (1) the Contract, which he admittedly signed on behalf of Kensington, was inconsistent with the actual billings of Development; (2) that the tax credit submissions and his personal tax returns included costs based upon the Contract, or (3) that new invoices were created and submitted to support the costs.

Aside from this professed ignorance of the tax credit application filings, Fareri asserted that the filings were fraudulent and improper, and Development's claim could not be rightly sustained based upon these fraudulent documents and filings. He alleges that the Contract and the new invoices were created solely to improperly support an increased tax credit for himself. He further alleges that he is attempting to correct the tax credit filings for the Site Preparation Credit and has amended the Tangible Property Credit application to delete all Development billings for its own personnel. Fareri concedes additional compensation is due to Development but less than what is provided for in the Contract.

In response to Kensington's defense, Carnicelli argues that the Contract was signed by Kensington and Development and is a binding obligation and should be enforced. Carnicelli further argues that the increase in fees and reimbursements to Development were a way for Fareri

and Carnicelli to "true up" the actual fees to be paid to Development which he alleges Fareri and he had orally agreed to do after completion of the Project.

## DISCUSSION & FINDINGS

Summary of Findings

For the reasons set forth below, we find the Contract to be a valid and binding obligation of Kensington and should be enforced in accordance with its terms.   Summarily, the Contract was admittedly executed by Carnicelli on behalf of Development and Fareri on behalf of Kensington, and until the eve of the hearings, Kensington affirmatively argued that the Contract was valid.   It sought damages of approximately $3,000,000.00 for breach of the Contract and breach of fiduciary duty owed under the Contract by Development (see, Answering Statement; see Fareri Declaration Affidavit (C-93).

As stated above, shortly before the first evidentiary hearing, after discovery was virtually complete, Development disavowed the validity of the Contract, withdrew its counterclaim and argued that the Contract was created by Carnicelli and employees of Fareri without his knowledge for fraudulent purposes (which notably benefitted Fareri personally), and so, the Contract was not enforceable at all.   During the hearings, Kensington admitted a contractual relationship existed between it and Development, and that Development was owed more than what it had been paid.   However, Kensington vacillated as to the terms of the agreement and what precisely was owed to Development.   Under these circumstances we find the Contract, admittedly executed freely by Carnicelli and Fareri, to be the accurate representation of the agreement of the parties and should be enforced.

Moreover, Kensington, relying on the advice of an expert it had retained, recorded liabilities to Development for project costs it incurred in calendar years 2016 and 2017 upon which it relied when reporting the project costs on both its Federal and New York State Partnership Returns, all executed under penalties of perjury affirming these legal obligations. The liabilities included in the Contract are the liabilities Kensington previously recorded and on which it relied to claim millions of dollars of Brownfield Tax Credits ("BTC") from New York State which were allocated to its members. We were not persuaded by Kensington's and Fareri's attempts to amend the returns and filings after the dispute with Development arose and Development sought the benefits of the Contract.

Respondent's Answering Statement and Detailed Statement of Setoff and Counterclaim

In Respondent's Answering Statement and Detailed Statement of Setoff and Counterclaim dated May 22, 2020 ("Answering Statement"), Kensington did not claim the Contract was invalid, but conceded that the Contract was a valid agreement entered into by Development and Kensington (Answering Statement, par. 5) and that it was breached by Development. Kensington referenced each of the terms of the Contract that it now seeks to avoid; the "reimbursable rates for project staff for the cost of the Project.....;" (the rates referenced are the RSMeans rates found in the Contract); "under Article VII of the (Contract) the Construction Manager was only entitled to a 10% fee for 'Site Prep' costs associated with the Brownfield remediation phase[2], plus a one-time bonus of $1,250,000.00....." (Answering Statement, Par. 6).

Thus, Kensington did not contest the RSMeans rates, the "one-time bonus" or the construction management ("CM") fee on the site preparation work. It did not allege that

---

[2] Development seeks 10% construction management fee on the Tangible portion of the Project as well.

Kensington's internal audit revealed that RS Means rates, the CM fee and the bonus were improper charges as it now does. Rather, Kensington alleged that the internal audit in November 2019 instead found overbillings by Development having nothing to do with the RSMeans rates, the CM fee or the bonus. Kensington alleged that Carnicelli, acting through Development, breached the Contract by overbilling the Project through overstaffing and billing for work performed at other Projects. (Answering Statement, par. 6)

Specifically, Kensington alleged that Development "billed for project managers and staff at 4.33 weeks per month, regardless of whether staff was on vacation, sick or working on other projects......" thereby overbilling the Project by $291,930.00. (Answering Statement, par.13)   It further alleged that Development "overstaffed the Project........, including between five and six full-time managers, when the needs of the Project should have required no more than three full-time management personnel" for an overcharge of $259,800.00. (Answering Statement, par.14) Also, among other things, Kensington argued that Development billed $1,458,282.72 for vendors supplying work to other projects including Carnicelli's private residence (Answering Statement, par. 9). In all Kensington claimed that Development owed Kensington nearly $3,000,000.00 for charges that were not in accordance with the Contract.

The Answering Statement also confirmed that "Kensington submitted the (Contract) and labor invoices for audit by NYSDEP in conjunction with obtaining the (Brownfield) credit." (Answering Statement, par. 7)

Although the affirmative counterclaim was ultimately withdrawn by Kensington through its Amended Answering Statement dated September 23, 2020, the withdrawal did not come with a clear repudiation of the Contract, but rather, with an acknowledgment of the existence

of the Contract but "leav(ing) the Claimant to its proof as to its operative effect." (see, Amended Answering Statement)  There was no mention of illegality or fraud in this amended pleading.

Fareri Declaration

Kensington also submitted a sworn Declaration from Fareri dated January 31, 2020 in conjunction with Kensington's motion to dismiss.  In that sworn statement, which he stated was "based upon personal knowledge," Fareri again did not deny the Contract's validity but made the same claims concerning overbilling, overmanning of the Project, and submission of vendor invoices by Development for work on other projects in breach of Development's obligations under the Contract.  (C-93)

Fareri Hearing Testimony

In his hearing testimony, Mr. Fareri, in effect, repudiated the A134 Agreement and the Contract, but stated that Development was due more than just the pass-through sums described in the A134 Agreement, but not as much as required by the Contract.  He further testified that he was unsure of the amount actually due to Development in addition to what had been paid, at times claiming that approximately $810,000.00 was due (see Hearing testimony, Day 7, pages 1564-1568), and later $510,795.00 (Id, page 1575).  There was also some vague testimony that the 1% shown on the pro formas submitted to Kensington's lender was the proper CM fee due to Development, which, it was claimed, would have been paid had Development simply billed it.

We find Fareri's testimony that he was unaware of the existence of the Contract or its terms, and that it was prepared solely for nefarious purposes (for the benefit of Fareri personally) by Mr. Sheskier, Joseph Moukattaf and Fareri consultants to be inaccurate at best, at

13

the very least unpersuasive, and inconsistent with his Declaration.   This testimony is belied by, among other things, the fact that although Fareri contends that Mr. Sheskier created and submitted fabricated documents and invoices to governmental authorities placing Fareri in serious criminal jeopardy, Mr. Sheskier is still employed by Fareri and is apparently managing his attempts to withdraw these purportedly fraudulent documents.   Additionally, Mr. Sheskier continues to be Fareri's attorney-in-fact.   In any event, Fareri is a sophisticated businessman who is bound by documents he willingly executed including the Contract.

We also find that filings and payment applications submitted to Kensington's lender do not control the contractual relationship between Development and Kensington, and so, they do not impact our view that the Contract should be enforced in accordance with its terms.

We further find Kensington's contention that the Contract applied only to the Site Preparation work and not the Tangible Property work to be unsupported by the language of the Contract itself and inconsistent with Kensington's own records.

The Brownfield Tax Credit Issue ("BTC")

As stated above, Kensington ultimately argued that the Contract created to support the BTC it claimed for 2016 and 2017 was prepared without Fareri's knowledge for the illegitimate purpose of increasing Mr. and Mrs. Fareri's BTC, and so, unenforceable.   We reject this contention for several reasons.

First, Kensington retained the services of an expert to advise it on how to maximize the tax credit and accepted the advice of that expert in establishing rates and costs to be paid to Development consisting of the RSMeans labor rates, a bonus, and a CM fee.   Second, Kensington recorded these costs as amounts payable to Development for 2016 and 2017 prior to executing the

Contract which, by its execution, ratified its prior actions recording the amounts payable to Development. Finally, as stated above, we find not credible Fareri's testimony that he was unaware of these activities and the filing of the IT-611.1 forms and tax returns, submitted under oath, which inured only to his personal benefit.

        We note that Fareri took full advantage of the actions of Mr. Sheskier, Mr. Moukattaf and his consultants until October 2019 when Mr. Carnicelli sought the benefits of the Contract, after which he was summarily discharged, and Kensington sought to disavow the documents and filings. We also find that in creating the Contract, Kensington dictated the terms and did so for dual purposes, first to increase the Brownfield tax credit, but also to fairly compensate Development for its services. This is supported by Fareri's testimony that the A134 Agreement did not accurately reflect what Development was to be paid for its services. Concerning the tax credit filings, the evidence established that the filings, with their detailed schedules, were prepared by and filed by Mr. Scheskier and Mr. Moukattaf. Carnicelli's involvement consisted of the preparation of the Contract whose terms were dictated by Mr. Sheskier and Mr. Moukattaf and matching Development workers to the categories found in RSMeans. We found no credible evidence to support a finding of fraud by Carnicelli or Development.

        Regardless, we heard no testimony to support the contention that matching the remediation and construction costs to market rates and submitting them to support a tax credit would be improper, provided that the costs are actually paid. It is obvious that filing documents showing higher costs than actually incurred would be improper, but here Kensington, by the written Contact, bound itself to pay the additional costs. In fact, as noted above, Fareri conceded that Development was due more than the pass-through amounts it was paid although he was unable

to precisely arrive at the amount actually due, in effect saying that it was more than the A134 Agreement but less than provided for in the Contract.

## Monetary Award

Claimant submitted an expert report from Scott Rutter, CPA of CitrinCooperman, and Mr. Rutter testified at the hearings. The report and testimony followed the terms of the Contract. In arriving at each component of damages, Mr. Rutter calculated the amount due under the Contract and subtracted the amount previously paid to Development to arrive at the amount he claimed was due to Development. In the instances where actual invoices to calculate costs were not available to him, he credibly extrapolated the amount due from ancillary documents that we found to be sufficient.

Respondent submitted a report from Patrick A. McGeehin of FTI Consulting, and Mr. McGeehin testified at the hearings. Although a credible witness, Mr. McGeehin did not contest the amount of the damages found in the Rutter report, but rather relied almost exclusively on the position that the Contract was unenforceable. As stated above, we have found the Contract to be enforceable, and so we have not incorporated Mr. McGeehin's calculation of damages in this Award although his opinion was considered.

In accordance with the findings above, we Award Claimant, The Gateway Development Group, Inc., the following:

| 1. | Site Prep Labor Balance Due– 2016 | $1,571,329.00 |
| 3. | Site Prep Work Bonus – 2016 | $1,250,000.00 |
| 4. | Site Prep Construction Manager's Fee – 2016 | $1,151,031.00 |

| 5. | Tangible Labor Balance Due– 2017 | $2,475,812.00 |
| 6. | Tangible Portion Bonus - 2017 | $0.00 |
| 7. | Tangible Construction Manager's Fee – 2017 | $4,486,983.00 |
| 8. | Tangible Labor Balance Due - 2018 | $1,023,247.00 |
| 9. | Tangible Portion Bonus - 2018 | $0.00 |
| 10. | Tangible Construction Manager's Fee – 2018 | $534,394.00 |
| 11. | Tangible Labor Balance Due - 2019 | $181,388.00 |
| 12. | Tangible Portion Bonus - 2019 | $0.00 |
| 20. | Tangible Construction Manager's Fee – 2019 | $43,173.00 |
| | TOTAL | $ 12,717,357.00 |

Interest, Costs and Counsel Fees

We have determined that the appropriate starting point for interest is December 31, 2019, and the appropriate interest rate to be New York's statutory rate of 9% per annum.

As to Development's claim for costs and counsel fees, the Contract does not provide for a prevailing party award of counsel fees. Rule 48 (d)(ii) permits the panel to award counsel fees if all parties request them. Here, Claimant and Respondent initially requested an award of costs and counsel fees but, with the permission of the Panel, Respondent withdrew its counterclaim which included the request for the award of costs and counsel fees, and so, we are without authority to make such an award under Rule 48 (d)(ii).

Claimant has argued that under New York Business Corporation Law 626(e), Mr. Carnicelli is entitled to an award of cost and fees to himself, individually, from Respondent. That statute, however, concerns the award of counsel fees to a shareholder from the corporation on

whose behalf she or he successfully prosecuted a claim, in this case from Development. The statute does not increase the liability of a defendant (Kensington) for attorneys' fees and costs from what would be available in a non-derivative action.

In denying the claim for counsel fees, we make no determination concerning Mr. Carnicelli's entitlement through New York Business Corporation Law 626(e), shareholders' agreement or otherwise to reimbursement of fees and costs from Development that he may have advanced to prosecute the claim.   However, that is not a matter properly before the Panel, and we must leave it to be decided in another forum.

The administrative fees of the American Arbitration Association totaling $30,110.38 and the compensation of the arbitrators totaling $163,059.00 shall be borne by Kensington. Therefore, Kensington shall reimburse Carnicelli the sum of $104,640.38, representing that portion of said fees in excess of the apportioned costs previously incurred by Carnicelli.

Accordingly, within 30 days of the date of this Award, Respondent Gateway Kensington, shall pay to Claimant The Gateway Development Group, Inc. the sum of $12,717,357.00, plus interest from December 31, 2019 to April 26, 2021 totaling $1,511,449.00, plus arbitration compensation and AAA fees in the amount of $104,640.38 for a total Award of $14,333,446.38. If payment is not made within the 30 days allotted above, interest will accrue thereafter on any unpaid amount at the statutory judgment rate of 9% per annum.

To the extent that claims or defenses are not specifically mentioned above, they were considered and rejected. This Award is in full settlement of all claims and counterclaims submitted in this Arbitration. All claims not expressly granted herein are hereby denied.

This Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

4/25/2021
_____
Date

_____
Thomas J. Rossi


_____
Date

_____
Peter Liloia III


_____
Date

_____
William Chandler

I, Thomas J. Rossi, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Award.

_4/15/21_
Date

_Thomas J. Rossi_

I, Peter Liloia III, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Award.

_____
Date

_____
Peter Liloia III

I, William Chandler, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Award.

_____
Date

_____
William Chandler

This Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

_____          _____
Date                             Thomas J. Rossi


_____          _____
Date                             Peter Liloia III


_____4/23/2021_____          _____
Date                             William Chandler

I, Thomas J. Rossi, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Award.

_____                    _____
Date                                                            Thomas J. Rossi

I, Peter Liloia III, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Award.

_____                    _____
Date                                                            Peter Liloia III

I, William Chandler, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Award.

_____4/23/2021_____                    _____
Date                                                            William Chandler

This Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

_____          _____
Date                                 Thomas J. Rossi


*APRIL 23, 2021*
_____          _____
Date                                 Peter Liloia III


_____          _____
Date                                 William Chandler

19

I, Thomas J. Rossi, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Award.

_____          _____
Date                                                   Thomas J. Rossi


I, Peter Liloia III, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Award.

APRIL 23, 2021                           _____
Date                                                   Peter Liloia III


I, William Chandler, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Award.

_____          _____
Date                                                   William Chandler

20

# EXHIBIT B

DOCKET NO.: FST-X08-CV-20-6048778-S     :     SUPERIOR COURT

JAMES CARNICELLI, JR.,     :     JUDICIAL DISTRICT
            STAMFORD/NORWALK
V.     :     COMPLEX LITIGATION
            DOCKET

    :

JOHN J. FARERI, JULIE FARERI,
CHRISTOPHER SHESKIER AND THE     :
GATEWAY DEVELOPMENT GROUP, ET AL.     March 5, 2021

## MEMORANDUM OF DECISION
## RE: MOTION TO DISMISS

### I.

### PROCEDURAL HISTORY

On October 9, 2020, the plaintiff/derivative plaintiff, James Carnicelli, Jr. ("Carnicelli")

filed a complaint against the defendants John J. Fareri, Julie Fareri, Christopher Sheskier

("Sheskier") and The Gateway Development Group, Inc. ("Gateway") (collectively "the

defendants") in his individual capacity and in a derivative capacity as the sole minority

shareholder of Gateway.   The plaintiff has asserted twelve counts against the defendants in his

Complaint, Counts One through Seven brought in plaintiff's individual capacity and Counts

Eight through Twelve brought derivatively in plaintiff's capacity as the sole minority

shareholder of Gateway.

On January 11, 2021, the defendants moved to dismiss Counts Five through Twelve of

the Complaint on the grounds this Court lacks subject matter to adjudicate such claims on the

following grounds: (1) plaintiff improperly pled derivative claims that belong to Gateway as

individual claims; and (2) plaintiff lacks standing to bring any derivative claim against Gateway.

1

Plaintiff has asserted in Count Five a claim for breach of the covenant of good faith and fair dealing as against John Fareri and Gateway; in Count Six a claim for violation of the Connecticut Unfair Trade Practices Act, 42-110(b) et seq. ("CUTPA") as against John Fareri, Julie Fareri and Sheskier; in Count Seven a claim for fraud as against John Fareri; in Count Eight derivative claims for breach of fiduciary duty as against John Fareri, Julie Fareri and Christopher Sheskier; in Count Nine a derivative claim for aiding and abetting John Fareri's breach of fiduciary duty as against Julie Fareri and Christopher Sheskier; in Count Ten a derivative claim for statutory theft pursuant to General Statutes § 52-564 as against John Fareri; in Count Eleven a derivative claim for conversion of funds as against John Fareri; and in Count Twelve a derivative claim for the violation of CUTPA as against John Fareri, Julie Fareri and Sheskier. The defendants also moved to stay this action pending the conclusion of an arbitration known as the Bronxville Project Arbitration.

On February 12, 2021, the plaintiff filed a memorandum of law in opposition to the defendants' Motion to Dismiss. On February 19, 2021, the defendants filed a reply memorandum. This Court held a hearing on the Motion to Dismiss on February 23, 2021.

## II.

## FACTUAL BACKGROUND

For purposes of this Motion to Dismiss, the Court finds the following facts. Plaintiff is the president of Gateway and defendant John Fareri is the Chairman of the Board of Directors, an officer and sole majority shareholder of Gateway. (Compl. ¶¶ 7-8.) Gateway is a construction services company created by John Fareri in 2006 for other entities he controls. (Compl. ¶ 14). In 2014, John Fareri, plaintiff and Gateway entered into a Shareholders' Agreement effective

2

January 14, 2014 ("Shareholders' Agreement"), pursuant to which Gateway issued ninety-eight shares to plaintiff and John Fareri continued to own 102 shares. (Compl. ¶ 15.) Plaintiff and John Fareri are the sole shareholders of Gateway. Paragraph 4.1 of the Shareholders' Agreement lists three officers who "shall remain as such during the entire term of this Agreement:" John Fareri as Chairman of the Board of Directors, plaintiff as President and Julie Fareri as Secretary. (Compl. ¶ 17.) Pursuant to paragraph Five of the Shareholders' Agreement, plaintiff was to receive a base salary of $250,000 as president of Gateway and shareholder distributions based on his 49% ownership interest in Gateway. (Compl. ¶¶ 19- 20.) The plaintiff alleges that pursuant to the Shareholders' Agreement, no officer, including plaintiff, shall be removed with or without cause, for any reason whatsoever, during the term of the Shareholders' Agreement. (Compl. ¶ 18.) The plaintiff alleges that John Fareri falsely represented to him that Gateway would be paid the profits that were usual and customary in the construction industry for the jobs that Gateway would do for other entities owned 100% by John Fareri and that plaintiff relied on such representations. (Compl. ¶¶ 20, 90-91.) The plaintiff alleges that he took an active role in managing Gateway as it worked on and completed numerous projects for entities controlled by John Fareri, but the Fareri controlled entities failed to pay Gateway the profits it had earned. (Compl. ¶ 27.) The plaintiff alleges that notwithstanding his obligations to Gateway as an officer and majority shareholder, John Fareri kept the profits from the various projects in his other entities and withheld them from Gateway and plaintiff. (Compl. ¶ 27.)

In his complaint, the plaintiff cites to a condominium development for the Village of Bronxville, New York (the "Bronxville project") as an example of John Fareri's wrongdoing. (Compl. ¶ 28.) The plaintiff alleges that Gateway performed extensive environmental mediation

3

and construction work for Gateway Kensington, LLC ("Gateway Kensington") an entity controlled by John Fareri, and that as a result of Gateway's work, Gateway Kensington sold the Bronxville condominiums for over $100,000 million dollars. (Compl. ¶¶ 28-29.)   Plaintiff alleges that John Fareri received millions of dollars in profits through Gateway Kensington, but did not pay Gateway the $16 million dollars in labor rates and fees that remain due for work done on the project. (Compl. ¶¶ 28-30.)  The Bronxville Project is currently in arbitration.  In his complaint, the plaintiff cites this as just one of the examples where John Fareri and his entities refused to pay Gateway its fees for multiple Projects.  (Compl. ¶ 31.)

The plaintiff alleges that when he demanded that John Fareri honor his obligations and pay Gateway the monies due and owed to it, John Fareri suspended Gateway's operations and terminated the plaintiff, notwithstanding that such termination was expressly prohibited by the Shareholders' Agreement. (Compl. ¶ 33-34.)  Upon the suspension of Gateway's operations, John Fareri with the help of Julie Fareri, transferred Gateway's assets and projects away from Gateway to other Fareri controlled entities. (Compl. ¶ 36.)  The plaintiff alleges that John Fareri and Sheskier also manipulated the financial records of Gateway to benefit John Fareri at the expense of Gateway and plaintiff, the only other shareholder. (Compl. ¶¶ 44-45.)  Plaintiff alleges that he has not been paid his salary since October 2019 in violation of the Shareholders' Agreement. (Compl. ¶ 41.)

## III.

## DISCUSSION

"[A] motion to dismiss . . . properly attacks the jurisdiction of the court, essentially asserting that the plaintiff cannot as a matter of law and fact state a cause of action that should be heard by the court." (Internal quotation marks omitted.) *Santorso* v. *Bristol Hospital*, 308 Conn. 338, 350, 63 A.3d 940 (2013). The grounds which may be asserted in a motion to dismiss are: "(1) lack of jurisdiction over the subject matter; (2) lack of jurisdiction over the person; (3) insufficiency of process; and (4) insufficiency of service of process." Practice Book § 10-30. "A motion to dismiss tests, inter alia, whether, on the face of the record, the court is without jurisdiction." (Internal quotation marks omitted.) *MacDermid, Inc.* v. *Leonetti*, 310 Conn. 616, 626, 79 A.3d 60 (2013).

"Pursuant to the rules of practice, a motion to dismiss is the appropriate motion for raising lack of subject matter jurisdiction." *St. George* v. *Gordon*, 264 Conn. 538, 545, 825 A.2d 90 (2003). "A court deciding a motion to dismiss must determine not the merits of the claim or even its legal sufficiency, but rather, whether the claim is one that the court has jurisdiction to hear and decide." (Internal quotation marks omitted.) *Hinde* v. *Specialized Education of Connecticut, Inc.*, 147 Conn. App. 730, 740-41, 84 A.3d 895 (2014). "[B]ecause the issue of standing implicates subject matter jurisdiction, it may be a proper basis for granting a motion to dismiss." *Electrical Contractors, Inc.* v. *Dept. of Education*, 303 Conn. 402, 413, 35 A.3d 188 (2012). "If a party is found to lack standing, the court is without subject matter jurisdiction to determine the cause." (Internal quotation marks omitted.) *Fort Trumbull Conservancy, LLC* v. *New London*, 282 Conn. 791, 802, 925 A.2d 292 (2007). "As the doctrine of absolute immunity concerns a

5

court's subject matter jurisdiction . . . in determining whether a court has subject matter jurisdiction, every presumption favoring jurisdiction should be indulged." (Internal quotation marks omitted.) *Tyler* v. *Tatoian*, 164 Conn. App. 82, 87, 137 A.3d 801, cert. denied, 321 Conn. 908, 135 A.3d 710 (2016).

### A.   Individual Claims

The defendants have first moved to dismiss plaintiff's Counts Five, Six and Seven which respectively assert claims for breach of the covenant of good faith and fair dealing, violation of CUTPA and fraud on the grounds that plaintiff improperly pled such claims as individual claims, when such claims seek to recover funds on behalf of Gateway that John Fareri either allegedly diverted or failed to pay.

"A distinction must be made between the right of a shareholder to bring suit in an individual capacity as the sole party injured, and his right to sue derivatively on behalf of the corporation alleged to be injured." *Yanow* v. *Teal Industries, Inc.*, 178 Conn. 262, 281, 422 A.2d 311 (1979). "It is . . . well settled that if the injury is one to the plaintiff as a stockholder, and to him individually, and not to the corporation . . . the cause of action is personal and individual." Id., 281-82. This Court has reviewed the allegations set forth in Counts Five and Seven and finds that the claims asserted for breach of the covenant of good faith and fair dealing and fraud are properly brought in plaintiff's individual capacity. Accordingly, defendants' Motion to Dismiss Counts Five and Seven of the Complaint is denied. This Court concurs with defendants that the plaintiff's claim for violation of CUTPA set forth in Count Six of the Complaint is pled as a derivative claim and grants the defendants' Motion to Dismiss Count Six of the Complaint.

6

### B.    Standing

The defendants next move to dismiss Counts Eight through Twelve of the plaintiff's

complaint on the grounds that plaintiff lacks standing to bring these derivative claims.   Count

Eight asserts a derivative claim for breach of fiduciary duty as against John Fareri, Julie Fareri

and Sheskier; Count Nine asserts a derivative claim for aiding and abetting John Fareri's breach

of fiduciary duty as against Julie Fareri and Sheskier; Count Ten asserts a  derivative claim for

statutory theft pursuant to § 52-564 as against John Fareri; Count Eleven asserts a derivative

claim for conversion of funds as against John Fareri; and Count Twelve asserts a derivative

claim for the violation of CUTPA as against John Fareri, Julie Fareri and Sheskier.

"[A] party must have standing to assert a claim in order for the court to have subject

matter jurisdiction over the claim. . . . Standing is the legal right to set judicial machinery in

motion. One cannot rightfully invoke the jurisdiction of the court unless he has, in an individual

or representative capacity, some real interest in the cause of action, or a legal or equitable right,

title or interest in the subject matter of the controversy. . . . [Our Supreme Court] has often stated

that the question of subject matter jurisdiction, because it addresses the basic competency of the

court, can be raised by any of the parties, or by the court sua sponte, at any time." (Internal

quotation marks omitted.) *Lewis* v. *Slack*, 110 Conn. App. 641, 643, 955 A.2d 620, cert. denied,

289 Conn. 953, 961 A.2d 417 (2008). "Standing . . . is not a technical rule intended to keep

aggrieved parties out of court; nor is it a test of substantive rights. Rather it is a practical concept

designed to ensure that courts and parties are not vexed by suits brought to vindicate

nonjusticiable interests and that judicial decisions which may affect the rights of others are

7

forged in hot controversy, with each view fairly and vigorously represented." (Internal quotation marks omitted.) Id., 643-44.

"Since at least the middle of the 19th century, it has been accepted in this country that the law should permit shareholders to sue derivatively on their corporation's behalf under appropriate conditions. "[I]t is axiomatic that a claim of injury, the basis of which is a wrong to the corporation, must be brought in a derivative suit, with the plaintiff proceeding 'secondarily,' deriving his right from the corporation which is alleged to have been wronged." *Fink* v. *Golenbock*, 239 Conn. 183, 200, 680 A.2d 1243 (1996). "Derivative actions are governed by § 52-572j. Under § 52-572j, a shareholder who believes that the corporation has been harmed by the actions of corporate officers, directors or third parties may bring suit on behalf of the corporation, should the corporation fail to do so itself. In contrast, in order for a shareholder to bring a direct or personal action against the corporation or other shareholders, the shareholder must show an injury that is separate and distinct from that suffered by any other shareholder or by the corporation." *Fink* v. *Golenbock*, supra, 238 Conn. 200-01.

As a preliminary inquiry, "the defendants in a derivative action may properly question whether the plaintiff has standing in equity to act as a nominal shareholder acting on behalf of the corporation and the other shareholders." *Barrett* v. *Southern Connecticut Gas Co.*, 172 Conn. 362, 370, 374 A.2d 1051 (1977). Section 52-572j (a) "requires fair and adequate representation in order to possibly avoid antagonism . . . which may lead to conflicts such that the interest of other stockholders are disregarded in the management of the case." *Fink* v. *Golenbock*, supra, 238 Conn. 204.

8

In *Fink*, our Supreme Court identified eight factors for determining whether a plaintiff is a fair and adequate representative: "(1) whether the named plaintiff is the real party in interest and willingness to learn about the suit; (2) the plaintiff's familiarity with the litigation; (3) the degree of control exercised by attorneys over the litigation; (4) the degree of support given to the plaintiff by the other shareholders; (5) the plaintiff's personal commitment to the action; (6) the remedies sought by the plaintiff; (7) the relative magnitude of the plaintiff's personal interests as compared to the plaintiff's interest in the derivative action itself; and (8) the plaintiff's vindictiveness towards the other shareholders. . . . [T]he above factors are nonexclusive and interrelated, and that it is frequently a combination of factors that guides a court in determining whether a plaintiff meets the requirements of fair and adequate representation. . . . Not all factors will come into play in all cases, and in some cases there may be additional factors for the court to consider. The key is whether the nominal plaintiff's interests . . . and issues [are] coextensive with those of the class of shareholders he seeks to represent, and whether he is able to assure the trial court that as a representative, he will put up a real fight." (Citations omitted; internal quotation marks omitted.) *Fink* v. *Golenbock*, supra, 238 Conn. 205-06.

In the *Fink* case, the plaintiff had the status of one of only two shareholders in the corporation and the Supreme Court found that the plaintiff was a fair and adequate representative of the corporation. The Supreme Court held "[t]he rule is not that the plaintiff must fairly and adequately represent the interests of all other shareholders; rather, under § 52-572j, the plaintiff must answer to those shareholders who are *similarly situated*. In a case such as this, where there is only one other shareholder in the corporation and it is that shareholder who is allegedly responsible for the harm to the corporation, there is no other similarly situated shareholder and

9

the plaintiff should not be prevented from bringing an otherwise proper derivative action by an objection from the wrongdoing shareholder." (Emphasis in original) *Fink* v. *Golenbock*, supra, 238 Conn. 206-07.

In the present case, the plaintiff also has the status of one of two shareholders in Gateway and has alleged in the derivative claims asserted in Counts Eight through Twelve, that John Fareri, the only other shareholder in the corporation is responsible for the harm to the corporation. There is no other similarly situated shareholder that can assert these claims and the plaintiff's interests do in fact align with Gateway's, which ensures that the return of assets to Gateway will be vigorously litigated. While the plaintiff has brought individual claims in this action, those claims are not adverse to the interests of any similarly situated shareholder. Finally, while the plaintiff has asserted a claim for judicial dissolution of Gateway based on the actions of John Fareri, it is clear from the allegations in the complaint that the true adverse party is John Fareri who controls Gateway, whom plaintiff alleges acted in an illegal, oppressive, fraudulent manner and who has misapplied or wasted Gateway's assets. (Compl. Count One ¶ 49.) Based on the present facts, it is clear that the plaintiff should not be prevented from bringing the derivative claims set forth in Counts Eight through Twelve of the Complaint.

Based on the foregoing, this Court finds that plaintiff has standing to assert the derivative claims asserted in the Eighth through Twelfth Counts of the Complaint and the defendants' Motion to Dismiss such claims is denied.

## C.   Motion to Stay Action

The defendants have also moved to stay this action pending the outcome of the related arbitration over the Bronxville Project on the grounds that (1) the gravaman of plaintiff's

complaint is the Bronxville Project and the plaintiff alleges the same essential facts here as in the related arbitration; and (2) the plaintiff expressly alleges here that the primary purpose of this action is to distribute the award he anticipates in the related arbitration. The plaintiff in his memorandum in opposition to Motion for Stay denies: (1) that he is a party to the arbitration agreement; (2) that the gravamen of his complaint is the Bronxville Project; and (3) denies that he has alleged the same essential facts in here in this action as were alleged in the Bronxville Project Arbitration.

"Arbitration is a favored procedure in this state. . . . [T]he public policy favoring arbitration . . . is intended to avoid the formalities, delay, expense and vexation of ordinary litigation." (Citations omitted; internal quotation marks omitted.) *Board of Education* v. *East Haven Education Assn.*, 66 Conn. App. 202, 207, 784 A.2d 958 (2001). General Statutes § 52-408 provides, in relevant part, that a written agreement to arbitrate "shall be valid, irrevocable and enforceable except when there exists sufficient cause at law or in equity for the avoidance of written contracts generally." Our courts have employed the "positive assurance" test for arbitrability. "[J]udicial inquiry . . . must be strictly confined to the question whether the reluctant party did agree to arbitrate the grievance. . . . An order to arbitrate the particular grievance should not be denied unless it may be said with *positive assurance* that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." (Emphasis in original.) *White* v. *Kempner*, 229 Conn. 465, 473, 641 A.2d 1381 (1994).

General Statutes § 52-409 provides in relevant part: "[i]f any action for legal or equitable relief or other proceeding is brought by any party to a written agreement to arbitrate, the court in

11

which the action or proceeding is pending, upon being satisfied that any issue involved in the action or proceeding is referable to arbitration under the agreement, shall, on motion of any party to the arbitration agreement, stay the action or proceeding until an arbitration has been had in compliance with the agreement, provided the person making application for the stay shall be ready and willing to proceed with the arbitration."

Under this section, the court "must stay any action as to which the applicant for a stay can establish the following facts: (1) that both the applicant and the plaintiff are parties to a written arbitration agreement; (2) that one or more issues referable to arbitration under that agreement are involved in the action sought to be stayed; and (3) that the applicant is ready and willing to proceed to arbitration on such arbitrable issues." *Sordoni Skanska Construction Co., Inc.* v. *Charles Beckman Swanson Architects*, Superior Court, Complex Litigation Docket at Waterbury, Docket No. X02-CV- 00161286 (May 11, 2001, *Sheldon, J.*) (30 Conn. L. Rptr. 189).

In looking at the first prong of § 52-409, whether the applicant and plaintiff are parties to a written arbitration agreement, the court looks to the Arbitration Agreement itself. However, the defendants in support of their Motion for Stay, did not append the Arbitration Agreement to the memorandum in support of such motion or the reply memorandum that they filed after plaintiff raised the issue that he was not a party to the Arbitration Agreement. In fact, in defendants' reply brief they do not even address the issue that plaintiff is not a party to the Arbitration Agreement. As this Court has no evidence before it that the plaintiff is a party to a written arbitration agreement, the motion to stay this action fails on this ground. Notwithstanding the foregoing, this Court also notes that upon review of the allegations in the

12

complaint, this Court agrees with the plaintiff that Bronxville Project is not the gravamen of the Complaint or even central to a number of the claims made in the Complaint. In addition, the plaintiff's complaint at paragraph thirty, footnote one explicitly states that plaintiff is not seeking to recover any damages derivatively on behalf of Gateway for breach of contract on the Bronxville Project.

Accordingly, the defendants' Motion to Stay this action pending the resolution of the Bronxville Project Arbitration is denied.

## IV.

## CONCLUSION

Based on the foregoing, this Court grants the defendants' Motion to Dismiss the plaintiff's claims asserted in Count Six of the Complaint and denies the Motion to Dismiss Counts Five, Seven, Eight, Nine, Ten, Eleven and Twelve. This Court also denies the defendants' Motion to Stay this Action pending the resolution of the Bronxville Project Arbitration.

BY THE COURT:

OZALIS, J.

Decision entered in
accordance with the
foregoing 3/5/2021.
Summary court order
All counsel notified.

13

# EXHIBIT C

| | |
|---|---|
| DOCKET NO. FST-CV-20-6048778-S : | SUPERIOR COURT |
| JAMES CARNICELLI, JR., : | JUDICIAL DISTRICT OF |
|                 Plaintiff, : | STAMFORD/NORWALK |
| vs. : | AT STAMFORD |
| JOHN J. FARERI, JULIE FARERI, : | |
| CHRISTOPHER SHESKIER, and THE : | |
| GATEWAY DEVELOPMENT GROUP, INC., : | |
|               Defendants; : | |
| and : | |
| JAMES CARNICELLI, JR., : | |
|            Derivative Plaintiff, : | |
| vs. : | |
| JOHN J. FARERI, JULIE FARERI, and : | |
| CHRISTOPHER SHESKIER, : | |
|          Derivative Defendants, : | |
| and : | |
| THE GATEWAY DEVELOPMENT GROUP, INC.: | |
|         Nominal Defendant : | MARCH 31, 2021 |

## JOINT CASE MANAGEMENT SCHEDULE

Plaintiff James Carnicelli, Jr. ("Plaintiff") and Defendants John J. Fareri, Julie Fareri,

Christopher Sheskier and The Gateway Development Group, Inc. (collectively, "Defendants"),

hereby submit this proposed Joint Case Management Schedule, as follows:

| | Proposed Deadlines |
|---|---|
| Pleadings will be closed by | March 1, 2022[1] |
| Written discovery to be completed by (Completion includes resolution of all objections and answers/compliance provided) | September 1, 2021 |
| Depositions of defendants to be completed by | December 31, 2021 |
| Depositions of plaintiff to be completed by | December 31, 2021 |
| Depositions of all fact witnesses to be completed by | December 31, 2021 |
| Plaintiff to disclose experts by | January 31, 2022 |
| Depositions of Plaintiff's experts by | March 1, 2022 |
| Defendants will disclose experts by | April 1, 2022 |
| Deposition of Defendants' experts will be completed by | May 1, 2022 |
| Dispositive motions will be filed by | June 1, 2022 |
| Opposing memorandum/affidavits by | 45 days after filing dispositive motion |
| Reply memorandum by | 14 days after filing opposing memorandum |
| Argument scheduled for | TBD – to be discussed with the Court |
| Joint Trial Management Report due | 1 week before Trial Management Conference |
| Trial Management Conference scheduled for | TBD – to be discussed with the Court |
| Date to Begin Trial/Jury Selection | TBD – to be discussed with the Court |
| Preliminary estimate of trial length (excluding jury selection) | 10 days |

---

[1] This deadline contemplates adjudication of Defendants' Request to Revise, Motion to Strike, and a possible second Motion to Strike with respect to any Substituted Complaint filed by the Plaintiff, as well as adjudication of Plaintiff's Motion to Dismiss, Request to Revise and Motion(s) to Strike any counterclaim(s) that may be filed by Defendants.

Respectfully submitted,

THE PLAINTIFF,

JAMES CARNICELLI, JR.


By: /s/ Joseph M. Pastore
Joseph M. Pastore III, Esq.
Melissa Rose McClammy, Esq.
Pastore & Dailey LLC
4 High Ridge Park, Third Floor
Stamford, CT 06905
jpastore@psdlaw.net
mmcclammy@psdlaw.net
Firm Juris #433711
P: 203-658-8454
F: 203-348-0852

THE DEFENDANTS,

JOHN J. FARERI, JULIE FARERI,
CHRISTOPHER SHESKIER, and THE
GATEWAY DEVELOPMENT GROUP,
INC.


By: /s/ Sara J. Stankus (435375)
Timothy T. Corey, Esq.
Christopher V. Fenlon, Esq. (Pro Hac Vice)
Sara J. Stankus, Esq.
HINCKLEY, ALLEN & SNYDER LLP
20 Church Street, 18th Floor
Hartford, CT 06103
Firm Juris #428858
P: 860-725-6200
F: 860-278-3802
tcorey@hinckleyallen.com
cfenlon@hinckleyallen.com
sstankus@hinckleyallen.com
-Counsel for all defendants-

-and-


By: /s/ Johanna G. Zelman
Johanna G. Zelman
Elizabeth M. Smith
FORDHARRISON, LLP
CityPlace II
185 Asylum St., Ste. 610
Hartford, CT 06103
Firm Juris #426943
P: 860-741-1361
F: 860-578-2075
jzelman@fordharrison.com
esmith@fordharrison.com
-Counsel for The Gateway Development
Group, Inc. and John J. Fareri-

**CERTIFICATION OF SERVICE**

I hereby certify that a copy of the foregoing was sent by email this 31st day of March,

2021, to all counsel and self-represented parties of record.

Joseph M. Pastore III, Esq.
Melissa Rose McClammy, Esq.
Pastore & Dailey LLC
4 High Ridge Park, Third Floor
Stamford, CT 06905
jpastore@psdlaw.net
mmcclammy@psdlaw.net

By */s/ Sara J. Stankus (435375)*
Sara J. Stankus